**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Chantay Stubbs, | : | Case No. 4:11CV01140 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

## I. INTRODUCTION

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act), 42 U.S.C. §§ 401-434, 1381-1383f. Pending are the parties' briefs on the merits and Plaintiff's suggestion for the record attaching additional medical records (Docket Nos. 12, 15 and 19). For the reasons that follow, the Commissioner's decision is affirmed.

## II. PROCEDURAL BACKGROUND.

On February 26, 2008, Plaintiff filed applications for DIB and SSI alleging disability beginning on February 7, 2008 (Docket No. 10, pp. 111-113, 114-115 of 718). The requests for DIB and SSI benefits were denied initially and upon reconsideration (Docket No. 10, pp. 64-66, 67-

69, 73-75, 77-79 of 718). Administrative Law Judge (ALJ) Douglas Cohen held an administrative hearing on December 4, 2009, with Plaintiff, represented by counsel, and Ms. Karen Krull, a Vocational Expert (VE), giving testimony (Docket No. 10, p. 34 of 718). The ALJ rendered an unfavorable decision on January 29, 2010 (Docket No. 10, pp. 13-23 of 718). The Appeals Council denied Plaintiff's request for review on April 14, 2011, thereby rendering the ALJ's decision the final decision of the Commissioner (Docket No. 10, pp. 5-7 of 718). Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision (Docket No. 1).

### III. FACTUAL BACKGROUND.

A. **PLAINTIFF'S TESTIMONY.**

Plaintiff, a 43-year-old college student at Youngstown State University (YSU), testified that she uses a wheel chair "all the time" but could "walk a little." Plaintiff had no difficulty completing the five minute drive to YSU. A campus resource assisted Plaintiff with loading and unloading her wheelchair from the car and moving the wheelchair up and down the stairs. During the prior semester, she accumulated a 3.3 grade point average and her projected college graduation date was December, 2010 (Docket 10, pp. 40-42, 47-51)

Plaintiff lived alone in a second floor apartment of a building without an elevator. While in her apartment, she tried to walk suing her single prong cane (Docket 10, p.40, 47- 51).

Plaintiff's past relevant work included employment as a cashier, a customer service representative and a telemarketer (Docket No. 10, pp. 37, 53, 54 of 718). Plaintiff claimed that she could no longer perform this work because she was disabled as a result of her involvement in a motor vehicle accident in February, 2008 (Docket No. 10, p. 37 of 718). During the accident, Plaintiff sustained a right leg fracture and cartilage injury to her left knee. The symptoms of severe osteoarthritis were aggravated (Docket No. 10, pp. 38, 43 of 718). Plaintiff did not sustain optimal

2

medical improvement with inpatient rehabilitation or hardware implants. Plaintiff claimed that she was unable to sustain substantial gainful activity by reason of these medically determinable impairments (Docket No. 10, pp. 37, 38, 39, 40, 43 of 718).

A typical day's activities consisted of driving to school, attending classes, doing homework and watching television. Plaintiff did her own grocery shopping, but had assistance with doing laundry because the laundry room was in the basement of her apartment building. She also had assistance taking her wheelchair up the stairs to her apartment and down to the first floor of the building (Docket No. 10, pp. 44, 47, 48, 51 of 718). Plaintiff testified that she had no problems with sitting; however she could only walk for five to ten minutes at a time and she could stand for five minutes at a time. Plaintiff claimed that she could not do much lifting (Docket No. 10, pp. 40-41, 42-43, 48 of 718).

**B.    VE TESTIMONY.**

The VE categorized Plaintiff's work experiences as a cashier, a telemarketer and customer service clerk. The cashier position was classified as light work at the low end of semiskilled work. The telemarketer position was classified as sedentary work at the low end of semiskilled work. The customer service clerk position was classified as sedentary work at the low end of skilled work (Docket No. 10, pp. 53, 54 of 718).

The ALJ first posed a hypothetical of a claimant 45 years of age, who had a high school education and some college education, and past work experience that consisted of mostly sedentary work at the low end of the semiskilled level. The hypothetical claimant was limited to (1) light lifting and carrying, (2) standing or walking for two out of eight hours, (3) occasional climbing of ramps and stairs, (4) balancing and stooping, (5) no crouching, crawling or kneeling, (6) no operation of foot controls, (7) the use of a cane for ambulation and (8) no simultaneous carrying and

3

stair climbing (Docket No. 10, pp. 54-55 of 718).

The VE opined that this hypothetical claimant would be precluded from all past work except the customer service clerk position. Examples of other work that the hypothetical claimant could perform included alarm monitor or surveillance system monitor and assembler. Approximately 81,000 positions existed nationally for the job of alarm monitor or surveillance system monitor, approximately 50,000 jobs existed nationally for the position of assembler and approximately 77,000 positions existed nationally for the job of ticket checker (Docket No. 10, pp. 54-57 of 718).

In the next hypothetical, the ALJ asked the VE to consider the same worker with the following residual functional capacity: (1) sedentary work with rare, one to ten percent of the day climbing ramps and stairs, (2) rare balancing and stooping, (3) no crouching, crawling or kneeling, (4) no operation of foot controls, (5) the use of a cane for ambulation and (6) no simultaneous carrying and stair climbing, and (7) no walking or ambulation for more than five to ten minutes at a time. The VE stated that this hypothetical claimant could perform the customer service clerk job (Docket No. 10, pp. 56-57 of 718).

In the final hypothetical, the VE considered the same worker who would be off task 10 percent of the day on a consistent basis. The VE responded that there would be no jobs, including past work, which would be available to this hypothetical claimant (Docket No. 10, p. 57 of 718).

III. SUMMARY OF MEDICAL EVIDENCE FOR PHYSICAL IMPAIRMENTS.

On February 7, 2008, Plaintiff was treated at the St. Elizabeth Health **Center** Emergency Room for injuries sustained in a "motor vehicle crash." Dr. Carl Michael Dunham, M. D., a trauma surgeon, conducted a consultative examination. The diagnostics showed a tibia-fibula fracture and

the right knee showed a fracture of the proximal tibia and the distal fibula. He concluded that Plaintiff had a grade three open fracture of the right tibia (Docket No. 10, pp. 228-231, 247-258). An additional consultation was conducted with Dr. T. Morrison, D.O., who concurred with Dr. Dunham's assessment that Plaintiff had a grade three open fracture of the right tibia. He recommended that Plaintiff undergo irrigation and the removal of any dead, damaged or infected tissue before internal and/or external fixation of the right tibia (Docket No. 10, pp. 259-260 of 718).

Later on February 7, 2008, Dr. Bruce Ziran, an orthopedic surgeon, performed an open reduction and internal fixation of Plaintiff's right leg. Following irrigation and removal of dead, damaged and infected tissue from the open tibia fracture, screws were used to secure the wound. Plaintiff was prescribed a custom brace designed to facilitate touchdown weight bearing and range of motion in the ankle and knee. Early prophylaxis was considered to prevent venous thrombosis (Docket No. 10, pp. 240-244, 261-266 of 718; www.vitals.com/doctors/Dr_Bruce_Ziran.html).

On February 8, 2008, Dr. Dunham found that although the wound was healing, the proximal screw on Plaintiff on her tibia had "backed out a bit" (Docket No. 10, pp. 243-244 of 718).

Prior to Plaintiff's release to a rehabilitation care facility, Dr. Terrance Peut, M. D., a physical medicine and rehabilitation physician, conducted an examination of Plaintiff's need for pain control, her use of braces to ambulate, and her needs for physical and occupational therapy (Docket No. 10, pp. 269-270 of 718). Plaintiff was discharged from the Health Center and admitted to St. Elizabeth's Acute Rehabilitation Unit on February 13, 2008 with specific instructions for orthopedic treatment of both right and left lower extremities. In addition, her care givers addressed primary issues related to wound care, chronic pain, chronic constipation and insomnia (Docket No. 10, pp. 266-270, 300-311 of 718; www.vitals.com/doctors/Dr_Terry_Puet.html).

An orthopedic surgeon, Dr. James A. Shaer, conducted an alignment to help restore the

healing process on February 20, 2008. He noted that the proximal tibial and fibular shaft fractures remained non-displaced. However, there was marked narrowing of the knee joint space and severe degenerative joint disease involving the left knee and the joint formed by the kneecap and femur (Docket No. 10, pp. 290-292 of 718; www.vitals.com/doctors/Dr_James_Shaer.html).

On February 25, 2008, Plaintiff was admitted to the Boardman Specialty Care and Rehabilitation Center (Boardman). Dr. Santuccio Ricciardi, an internist, created a treatment plan that included physical therapy, occupational therapy and medicinal pain management for purposes of relieving chronic pain, insomnia and chronic constipation (Docket No. 10, pp. 292-495, 497-531, 538-539, 569-571 of 718; www.vitals.com/doctors/Dr_Santuccio_Ricciardi.html).

On March 21, 2008, Plaintiff complained of pain. An X-ray of the tibia and fibula showed a comminuted fracture in both the distal and proximal tibia and fibula (Docket No. 10, pp. 542-543 of 718).

On March 25, 2008, Dr. Ziran noted that Plaintiff had a screw that was "backing out." He proposed that the "backed out" screw could be safely removed since the proximal undisplaced tibial fracture had probably healed (Docket No. 10, p. 244 of 718). On April 3, 2008, Plaintiff underwent surgery to have the screw removed and the leg reevaluated. The screw was removed uneventfully, and Dr. Ziran noted there was good healing. Following the screw removal, Plaintiff returned to the rehabilitation facility (Docket No. 10, pp. 536-537, 690 of 718). On May 28, 2008, Plaintiff was discharged from the facility to her home (Docket No. 10, p. 375 of 718).

On July 15, 2008, Plaintiff underwent X-rays of her left knee and right ankle. Of the four views, there was evidence of osteoarthritic changes. There was no evidence of fracture, dislocation, destructive lesion or soft tissue abnormality in the ankle. The healing progressed and there was interval improvement when compared with the prior X-rays (Docket No. 10, pp. 564-566 of 718).

Beginning on July 25, 2008, Plaintiff was treated at Keystone Rehabilitation through the use of therapeutic exercise and aquatic therapy (Docket No. 10, pp. 604-616, 632-671 of 718).  Dr. John K. Sontich, an orthopedic surgeon, noted that there was solid fusion of the fibular shaft segmental fracture without significant deformity on August 19, 2008.  On August 21, 2008, he noted that Plaintiff's right segmental tibia fracture was healing.  Plaintiff continued therapy at Keystone (Docket No. 10, pp. 603, 699 of 718; www.vitals.com/doctors/Dr_John_Sontich.html).

On November 5, 2008, Dr. Gerald Klyop, M. D., completed the physical residual functional capacity assessment, opining that Plaintiff had no manipulative, communicative or environmental limitations and unlimited near acuity, far acuity, depth perception, accommodation, color vision and field of vision.  Further, it was Dr. Klyop's opinion that Plaintiff could (1)occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk at least two hours in an eight-hour workday, (4) sit about six hours in an eight-hour workday, (5) engage in unlimited pushing and/or pulling and (6) refrain from climbing using a ladder, rope or scaffold, kneeling, crouching or crawling(Docket No. 10, p. 671-678 of 718).

On November 11, 2008, Dr. Sontich compared the progress of the right tibia and fibula with studies of August 19, 2008 and noted the presence of a healed fracture of the proximal tibia and fibula with healed fracture of the distal fibular shaft and callus surrounding much of the fracture sight.  It appeared that Plaintiff was having more problems with her left knee (Docket No. 10, pp. 703-704, 711 of 718).

Dr. Sontich noted on February 10, 2009, that the pain had lessened in the right distal tibia. Plaintiff was offered a cortisone injection in her left knee (Docket No. 10, pp. 706, 707 of 718).

Dr. Ziran noted on April 10, 2009 that Plaintiff had been using a stimulator.  She had good range of motion and the soft tissue was stable.  X-rays showed that the fractures were healed.

7

Although there was a residual gap, the lateral part appeared to be bridging. The left knee showed significant arthritis in three compartments (Docket No. 10, pp. 680-681 of 718).

Dr. Sontich removed two additional screws on August 18, 2009 by(Docket No. 10, pp. 693-694 of 718). On September 1, 2009, the sutures were removed. Because of the left knee pain, Dr. Sontich administered a cortisone injection that provided minimal relief (Docket No. 10, pp. 683, 685, 686 of 718).

In addition to prescribing pain medication and a pain management consultation, Dr. Sontich prescribed a wheelchair on June 3, 2010 and a hinged knee brace on July 6, 2010 (Docket No. 10, pp. 714, 716, 717 of 718).

### IV. SUMMARY OF EVIDENCE FOR PSYCHIATRIC IMPAIRMENTS.

Plaintiff requested assistance with her psychiatric problems. On April 25, 2008, she underwent an evaluation at Turning Point, a counseling and psychiatric care service provider. She was diagnosed with a depressive disorder, not otherwise specified, and Plaintiff was prescribed Paxil, a medication used to treat depression (Docket No. 10, pp. 585-588 of 718).

A diagnostic assessment conducted by a licensed social worker at Turning Point on July 31, 2008, showed evidence of depressive and anxiety disorders. Plaintiff was experiencing a number of stressors including the residual effects from the car crash, bereavement issues and upcoming testimony at a trial. Plaintiff's primary care physician discontinued the prescription for Paxil and replaced it with Zoloft®, a medication used to treat, *inter alia,* depression and anxiety disorders (Docket No. 10, pp. 590-599 of 718).

On October 17, 2008, Dr. Cindy Matyi, Ph. D., completed a PSYCHIATRIC REVIEW TECHNIQUE form in which she found that there was documentation that Plaintiff had a depressive disorder, not otherwise specified, that did not satisfy the diagnostic criteria for an affective disorder

as defined at 12.04 of the Listing (Docket No. 10, pp. 617-630 of 718). The degree of functional limitations caused by the impairment resulted in (1) mild restriction of activities of daily living, (2) no deficiencies in maintaining social functioning, (3) mild difficulties in maintaining concentration, persistence or pace and (4) no episodes of decompensation, each episode of extended duration (Docket No. 10, p. 627 of 718).

### V. SUMMARY OF MEDICAL EVIDENCE PRESENTED DURING JUDICIAL REVIEW.

Plaintiff submitted supplemental medical records (Docket No. 19). A summary of the medical evidence follows.

On January 4, 2011, January 11, 2011, January 18, 2011, January 24, 2011 and February 1, 2011, injections under local anesthesia were administered to treat pain and swelling in the knee (Docket No. 19-1, pp. 6-8, 15-17, 22-24, 29-31, 37-39 of 64). Plaintiff reported continuing knee pain, stiffness and swelling on April 20, 2011. Medication was prescribed to assist with the pain and stiffness (Docket No. 19-1, pp. 40-43 of 64). Plaintiff presented on April 21, 2011 with knee pain. Noting that Plaintiff had sufficient medication prescribed for the treatment of pain, Plaintiff was referred to the pain clinic (Docket No. 19-1, p. 45 of 64).

X-rays administered on or about July 5, 2011, showed marked narrowing of the medial compartment with bone on bone contact with secondary prominent degenerative sclerosis; severe degenerative change in the lateral department; and moderate degenerative change in the patellofemoral area (Docket No. 19-1, p. 51 of 64).

On April 17, 2012, Dr. Sontich addressed the treatment options for post-traumatic arthritis of the left knee. He noted there were no hip symptoms. Based on a clinical examination, Dr. Sontich found that Plaintiff lacked ten degrees of full extension of the knee and flexes to about 110 degrees, that she was tender at the medial and lateral joints with crepitus (significant grating, crackling or

9

popping when ends of a fractured piece of bone rubbed against each other) and that her left lower extremity was slightly short compared to her right. At the conclusion of the evaluation, Plaintiff elected to undergo total left knee replacement surgery in August 2012 (Docket No. 19-1, pp. 59-60 of 64; medical-dictionary.thefreedictionary.com/crepitus).

### V. STANDARD OF DISABILITY.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C. F. R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively. For purposes of this case, the regulations are identical. To assist with clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time he or she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Substantial gainful activity is work that is both substantial and gainful. Substantial work activity is work activity involving significant physical or mental activities. 20 C. F. R. § 404.1572(a) and 20 C. F. R. § 416.972(a). Gainful work activity is work usually done for pay or profit, regardless of whether profit is earned or not. 20 C. F. R. § 404.1572(b) and 20 C. F. R. § 416.972(b).

Second, plaintiff must show that he or she suffers from a "severe impairment" or a combination of impairments that is "severe" in order to warrant a finding of disability. *Id.*; 20 C. F. R. § 404.1520(c) and 20 C. F. R. § 416.920(c). A "severe impairment" is one that "significantly limits the claimant's physical or mental ability to do basic work activities. *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent his or her from doing his or her past relevant work, plaintiff is not disabled. *Id.*

Lastly, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id*. (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id*. (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## VI. ALJ DETERMINATIONS.

After consideration of the entire record, the ALJ made the following findings of facts:

1. Plaintiff had not engaged in substantial gainful activity since February 7, 2008.

2. Plaintiff had the following severe impairments: status post motor vehicle accident with fracture of the right tibia/fibula, and arthritis involving the left knee.

3. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. Plaintiff had the residual functional capacity to perform a range of sedentary work as defined in 20 C. F. R. §§ 404.1567(a) and 416.967(a). Plaintiff could only rarely (1-10% of the work day) climb (ramps/stairs only),

      balance, and stoop; cannot crouch, crawl, or kneel; cannot walk more than five to 10 minutes at any one time; cannot operate food controls with the lower extremities; cannot perform work which is precluded by the need for a cane for walking; and, cannot perform carrying and stair climbing simultaneously.

5.     Plaintiff is unable to perform any past relevant work.

6.     Considering Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform

The ALJ determined that the Plaintiff had not been under a disability as defined in the Act since February 7, 2008, through the date of the ALJ decision. Therefore, she was not disabled under Sections 216(1), 223(d) and 1614(a)(3)(A) of the Act.

(Docket No. 10, pp. 18-22 of 718).

## VII. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. *Id.* (*citing* 42 U.S.C. § 405(g )). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in

the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).  Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

## VIII. ANALYSIS

There are four claims for which Plaintiff seeks judicial review and presents the following arguments.  First, remand for consideration of new evidence is warranted.  Second, the ALJ failed to consider her impairments in combination as required by 20 C. F. R. §§ 404.1523 and 416. 923.  Third, Plaintiff's claims met 1.02A of the Listing.  Fourth, Plaintiff should have been found unable to do substantial gainful activity.

Defendant responded by claiming that the ALJ considered the combination of Plaintiff's impairments.  Defendant contends that Plaintiff did not satisfy the medical criteria to meet or equal Section 1.02(A) of 20 C. F. R. Part 404, Subpart P, Appendix 1.  In addition, the ALJ appropriately found that Plaintiff's mental impairments did not preclude work activities.

### 1. SENTENCE SIX REMAND

Plaintiff seeks a remand to the Commissioner because new evidence has become available which could alter the outcome of her request for benefits.

Under sentence six of 42 U.S.C. § 405(g), this Court may remand a case to the Social Security Administration "because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the

outcome of the prior proceeding." *Farler v. Astrue,* 2011 WL 3715047, *6 (S. D. Ohio 2011) (*citing Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991)). A sentence six remand for consideration of additional evidence is warranted only if (1) there is good cause for the failure to incorporate this evidence into the record at the prior hearing, and (2) the evidence is new and material. *Id*. (*citing* 42 U.S.C. § 405(g); *see Melkonyan*, 111 S. Ct. at 2158; *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007)).

To be "material," new evidence (1) must be relevant to and probative of an applicant's condition prior to the Commissioner's decision, and (2) must establish a reasonable probability that the Commissioner would have reached a different decision if the evidence had been considered. *Id.* (*citing Smith v. Commissioner of Social Security*, 2008 WL 2311561, at *6 (S. D. Ohio 2008) (Barrett, J.) (*citing Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 711 (6th Cir. 1988); *Oliver v. Secretary of Health & Human Services*, 804 F.2d 964, 966 (6th Cir. 1986)). New evidence is cumulative and not sufficient to warrant remand if it relates to an issue already fully considered by the Commissioner. *Id*. (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Additionally, evidence that a plaintiff's health has deteriorated since the Commissioner's decision is not material to that application, and the appropriate remedy is to file a new application. *Id*. (*citing Sizemore*, *supra*, 865 F.2d at 712).

Here, it is undisputed that the evidence filed at Docket No. 19 was not available until after the administrative decision was made. Such new evidence, while probative of Plaintiff's condition and treatment prior to the Commissioner's decision, is cumulative. The proffered medical evidence is a successive addition to the series of alternate treatments Dr. Sontich had already employed and/or considered to alleviate continued complaints of pain. The medical evidence which described the minimal effects from a series of injections and a scheduled surgery maintained Plaintiff's

existing state prior to the Commissioner's decision. In all likelihood, the Commissioner would not have reached a different decision if this new evidence had been a part of the record's decision.

Remand for consideration of the new evidence is not warranted since it relates to an issue already fully considered by the Commissioner.

**2.  COMBINATION OF IMPAIRMENTS.**

Plaintiff argues that she has a combination of severe impairments that significantly limit her physical and mental capacity to perform basic work-related functions.

A plaintiff must show that she or he suffers from a "severe impairment" or a combination of impairments that is "severe" in order to warrant a finding of disability under step two of the five-step analysis. A "severe impairment" is one that "significantly limits the claimant's physical or mental ability to do basic work activities. 20. C.F. R. § 416.920(c); 20 C. F. R. § 404.1520(c) (Thomson Reuters 2012). The regulation provides that the ALJ "will consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Szymanski v. Commissioner of Social Security*, 2011 WL 4541299, *10 (N. D. Ohio 2011).

Initially, the ALJ reviewed Plaintiff's specific medical problems individually. Plaintiff's claim that she was unable to bear weight was contradicted by her physicians. On February 26, 2008, Dr. Ziran noted that she might continue weightbearing as tolerated while wearing the leg brace (Docket No. 10, p. 570 of 718). On March 25, 2008, Dr. Ziran noted, "once biologic activity begins we will go into a custom Crow Walker and begin weightbearing to try to stimulate healing" (Docket No. 10, p. 577 of 718). On April 22, 2008, following surgery for a screw removal, Dr. Ziran reported that he wanted her to start weight bearing using an assistive device (Docket No. 10, p. 578 of 718). Plaintiff's claim that she is unable to weight bear for the statutory time period is not

supported by the medical evidence, and cannot be considered as part of the combination of impairments.

Plaintiff's next claim that she suffered from a head injury and from headaches following the motor vehicle accident is limited to the care received while at Boardman from February 25, 2008 to May 28, 2008. Dr. Dunham noted a mild brain injury on Plaintiff's emergency room discharge summary (Docket No. 10, p. 229 of 718). Plaintiff was treated with Tylenol throughout her stay at Boardman for pain or elevated temperatures (Docket No. 10, pp. 307, 313, 319, 325 of 718). There is no further medical evidence of treatment for a head injury or headaches beyond her stay at Boardman which ended on May 28, 2008. Therefore, the ALJ could not conclude that Plaintiff's claims that a head injury and headaches resultant from the motor vehicle accident persisting for the statutory time period are not supported by the medical evidence, and cannot be considered as part of the combination of impairments.

Plaintiff's claims of obesity, vision problems, and anxiety are mentioned only in Plaintiff's history or as a statistic. Aside from a listing of obesity under "Diagnoses" on Plaintiff's order reports from Boardman, there is no medical evidence that her vision problems or obesity were conditions that were addressed or actively treated by any health care provider. There was no significant evidence that Plaintiff underwent ongoing treatment for anxiety after her psychiatric evaluation on July 31, 2008. While at Boardman, she was given Ambien as treatment for insomnia. There is no evidence that she suffered from insomnia or was treated for it after her discharge from Boardman (Docket No. 10, pp. 307, 313, 315, 319, 325, 593 of 718). For these reasons, Plaintiff's claims of obesity, vision problems and anxiety are not supported by the medical evidence, and cannot be considered as part of the combination of impairments.

Comparing the medical evidence pertaining to Plaintiff's severe impairments to the listed

impairments, the ALJ explicitly stated that Plaintiff "does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments" (Docket No. 10, p. 19 of 718). Having thoroughly discussed Plaintiff's allegation of combined impairments in his assessment of residual functional capacity, the structure of the ALJ's opinion and numerous references to the combination of impairments indicates the ALJ did consider the combined effect of those impairments that were medically determinable (Docket No. 10, pp. 19-20 of 718).

3.  SECTION 1.02 A OF THE LISTING.

Plaintiff argues that her combination of impairments meets or equal 1.02A of 20 C. F. R. Part 404, Subpart P, Appendix 1.

To meet the listing under 1.02 A of 20 C. F. R. Part 404, Subpart P, Appendix 1, there must be a major dysfunction of a joint characterized by gross anatomical deformity (e.g., subluxation (partial dislocation), contracture (permanent shortening of the muscle or joint), bony or fibrous ankylosis (stiffening of a joint), instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

- A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00 B 2 b;
- or
- B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Under 1.00 B 2 b of 20 C. F. R. Part 404, Subpart P, Appendix 1 defines the "inability to ambulate effectively" as an "extreme limitation of the ability to walk." This section continues by stating that "[i]neffective ambulation is defined generally as having insufficient lower extremity

functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Examples of this include the "inability to walk without the use of a walker, two crutches or two canes… the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 1.00 B 2 b of 20 C.F.R. Part 404, Subpart P, Appendix 1. This inability to ambulate effectively must last, or be expected to last, for twelve months or more. 1.00 B 2 a of 20 C.F.R. Part 404, Subpart P, Appendix 1.

      The ALJ acknowledged that Plaintiff's medical evidence supports severe dysfunction of her right leg and left knee resulting in difficulty in ambulation. The ALJ stated that Plaintiff likely met the listing for a short period of time, but that the dysfunction had resolved by December 2008 when she began to use a single point cane (Docket No. 10, pp. 18-19 of 718). Plaintiff did not require the sustained use of a walker or of two canes or crutches, where the functioning of both upper extremities was limited (Docket No. 10, p. 42 of 718). Though Plaintiff testified that she required her wheelchair at all times, her testimony also indicated that she carried out her own grocery shopping and was able to drive herself to and from school (Docket No. 10, pp. 40-39 of 718). Plaintiff's residual functional capacity evaluation, conducted by Dr. Klyop on November 5, 2008, noted that her symptoms were expected to significantly reduce and her functioning to greatly improve over the next four months (Docket No. 10, p. 676 of 718). Dr. Klyop also noted that Drs. Ricciardi and Ziran both expected her limitations to last no more than eleven months as of May 2008 (Docket No. 10, p. 677 of 718). Plaintiff's dysfunction did not meet the criteria under 1.00 B 2 b of 20 C. F. R. Part 404, Subpart P, Appendix 1.

      Plaintiff points out that the last D.D.S. involvement was November 15, 2008, more than a year before the ALJ hearing and that several additional records were added to the file after

18

November 2008 (Docket No. 12, p. 5 of 7). These records indicate that Plaintiff was undergoing pain management during this time frame, but Dr. Sontich also noted that her right leg appeared to be healed (Docket No. 10, p. 681 of 718). Additionally, two screws were removed from Plaintiff's right leg during this time (Docket No. 10, p. 693 of 718). The ALJ took this medical evidence into consideration acknowledging Dr. Sontich's findings in June 2009 that she "occasionally needs a wheelchair especially at college" and the x-ray evidence showed a healed fracture with slight valgus consistent with Dr. Sontich's remarks during surgery in August 2009.

Plaintiff has not presented substantial evidence that there exists a major dysfunction of any of her joints characterized by gross anatomical deformity. Unable to meet this threshold requirement, Plaintiff also failed to show that she was unable to ambulate effectively for twelve months or more. The ALJ did not err in failing to find that Plaintiff met 1.02 A of the Listing.

**4.  BEING OFF TASK UP TO 10% OF THE WORKDAY.**

Plaintiff suggests that she cannot sustain substantial work activity since her symptoms from the impairments would require her to be off task 10% of the day.

The Magistrate cites five reasons to discount Plaintiff's argument that she is not able to work because she will be off task more than 10% of the work day. First, Plaintiff has failed to articulate a level of her impairment that would keep her off task for ten minutes of every hour or that she would be precluded from work if taken off task for less than ten minutes per hour. Second, there is no evidence that being off task is automatically equivalent to being absent from the job and that being off task does not consider regular breaks, vacations or other forms of leave. Third, Plaintiff has failed to establish a bridge between her off task occasions and their frequency and the limitations on the types of tasks that she cannot carry out as a result of her off task occasions. Fourth, Plaintiff's testimony is not supportive of limitations greater that those set forth in her

residual functional assessment, which included, among other limitations, restricting her to sedentary work as a customer service clerk even if she were taken off task between 1 to 10% of the work period (Docket No. 10, p. 57 of 718). Fifth, the record shows that the VE indicated that being off task up to 10% per day would not affect productivity and the hypothetical worker in this case would likely maintain his or her job as a customer service clerk position.

The record does not show that Plaintiff could not sustain gainful employment because of her speculation that she will be off task for up to 10% of her work day. This argument lacks substantial support from the evidence and is not well taken.

## VIII. CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date: May 29, 2012